UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASTRONARDI INTERNATIONAL LIMITED, | CASE NO. 1:18-cv-00737-AWI-JLT |
| Plaintiff, | ORDER DENYING MOTION TO DISMISS OR STAY PROCEEDINGS PENDING ARBITRATION |
| v. | |
| SUNSELECT PRODUCE (CALIFORNIA), INC., | (Doc. No. 9) |
| Defendant. | |

This is a PACA[1] case brought by Plaintiff Mastronardi International Limited ("Mastronardi") against Defendant SunSelect Produce (California), Inc. ("SunSelect") over SunSelect's alleged failure to supply Mastronardi with tomatoes as required by a written agreement. Before the Court is SunSelect's Motion to Dismiss or Stay Proceedings Pending Arbitration. See Doc. No. 9. SunSelect argues that this case should be dismissed or stayed because the claims from Mastronardi are subject to arbitration pursuant to a written arbitration agreement. For the following reasons, the Court will deny SunSelect's motion.

## I. BACKGROUND

SunSelect is a company engaged in the business of growing perishable agricultural commodities,[2] such as tomatoes. See Doc. No. 1-1; Doc. No. 9-1. As part of that business,

---

[1] PACA, short for the "Perishable Agricultural Commodities Act," is a federal law that regulates the interstate perishable agricultural commodities industry. See 7 U.S.C. §§ 499a-499t.

[2] "Perishable agricultural commodities" are defined by the Perishable Agricultural Commodities Act as "[f]resh fruits and fresh vegetables of every kind and character." 7 U.S.C. § 499a(b)(4)(A).

SunSelect has held a "PACA license" since February 2017.  See Doc. No. 11-1; Doc. No. 11-2.[3]
A PACA license is a statutory license required of "persons"[4] who "carry on the business of a
commission merchant, dealer, or broker" in the perishable agricultural commodities industry.  See
7 U.S.C. § 499c(a).

Mastronardi is a company engaged in the business of buying and selling perishable
agricultural commodities in domestic and international markets.  See Doc. No. 11-1.  As part of
that business, Mastronardi buys and sells wholesale quantities of perishable agricultural
commodities, such as tomatoes, for shipment throughout the United States and Canada.  See id.;
Doc. No. 1-1.  Mastronardi has held a PACA license since July 2016.  See Doc. No. 11-1.

SunSelect and Mastronardi entered into a written agreement in January 2017.  See Doc. 9-
1 ¶ 2; Doc. No. 11-1 ¶ 8; Doc. No. 1-1.  Some of the terms of the agreement ("Agreement") are
that SunSelect would grow, cultivate, harvest, and produce a particular variety of tomato and then
sell those tomatoes exclusively to Mastronardi.  See Doc. No. 1-1; Doc. No. 9-1.  In return,
Mastronardi would purchase the tomatoes from SunSelect.  See Doc. No. 1-1.  The term during
which SunSelect would grow and Mastronardi would purchase the tomatoes was twelve
consecutive months, which the Agreement refers to as the "Harvest Period" and which
commenced in or around May 2017.  See Doc. No. 9-1; Doc. No. 1-1.  The Agreement provides
that the length of the Harvest Period can be adjusted by the parties depending on certain
circumstances, such as a *force majeure* event.  See Doc. No. 9-1; Doc. No. 1-1.

The Agreement contains a provision that identifies the procedures the parties will follow if
they have a dispute arising from the Agreement.  See Doc. No. 1-1 ¶ 22.  The provision includes
an arbitration agreement and states:

> 22.  Disputes.  In the event of any disputes arising between the Parties with respect
> to the interpretation of this Agreement or the performance or obligations hereunder
> by any party, any party may notify the other party of such and each of the parties
> will then refer the dispute to its respective chief executive officer, and the chief
> executive officers will negotiate in good faith to resolve the dispute promptly.  If

---

[3]  In response to Mastronardi's allegations and evidence indicating that SunSelect has held a PACA license since at
least February 2017, SunSelect has neither denied nor disputed that it has held a PACA license since February 2017.
See generally Doc. No 9; Doc. No. 12.
[4]  PACA uses the term "person" to refer to individuals, partnerships, corporations, and associations.  7 U.S.C. §
499a(b)(1).  Accordingly, the Court will occasionally refer to SunSelect, Mastronardi, and other entities as "persons."

the chief executive officers are unable to resolve the dispute, <u>the dispute shall be settled under procedures set out in PACA, if applicable, and if not applicable, the parties shall refer the dispute to a single arbitrator</u> appointed under the provisions of the Commercial Arbitration Act (British Columbia), whose determination will be final and binding on the Parties.

Doc. No. 1-1 ¶ 22 (emphasis added); <u>see also</u> Doc. No. 11-1 ¶ 9. Thus, pursuant to the Agreement, SunSelect and Mastronardi shall handle their disputes "under procedures set out in PACA" if PACA is applicable or, alternatively, through arbitration if PACA is not applicable. <u>See id.</u>; Doc. No. 1-1.

After SunSelect and Mastronardi entered into the Agreement, SunSelect began harvesting and delivering the tomatoes to Mastronardi pursuant to the Agreement. <u>See</u> Doc. No. 9-1. But then, according to SunSelect, approximately three months into the Harvest Period, on August 5, 2017, there was an unexpected power shutdown to SunSelect's greenhouse, which is where SunSelect was growing the tomatoes pursuant to the Agreement. <u>See</u> Doc. No. 9-1; Doc. No. 1-1. As a result of the power shutdown, the temperature in the greenhouse rose to 140 degrees Fahrenheit, causing severe and irreparable damage to the tomato plants. <u>See</u> Doc. No. 9-1. SunSelect determined that the tomato plants would not survive and, consequently, SunSelect told Mastronardi on September 8, 2017, that the tomato plants were ruined. <u>See id.</u> SunSelect made its last shipment of tomatoes to Mastronardi in early September 2017, and SunSelect destroyed the tomato plants remaining in the greenhouse. <u>See id.</u>

On May 30, 2018, Mastronardi filed suit against SunSelect in this Court. <u>See</u> Doc. No. 1. Some of Mastronardi's allegations from the complaint are as follows. First, SunSelect "breached the Agreement by failing or refusing to deliver the [tomatoes] to [Mastronardi] during the Harvest Period or otherwise." Doc. No. 1 ¶ 33. Second, SunSelect grew and then sold the tomatoes to persons or entities other than Mastronardi, which was a violation of the Agreement. <u>Id.</u> at ¶ 34. Third, although the Agreement required SunSelect to dedicate eight acres for specific purposes related to growing the tomatoes for Mastronardi, SunSelect utilized the eight acres for purposes other than those allowed by the Agreement. <u>Id.</u> at 62. Fourth, SunSelect "failed to demonstrate to or otherwise provide [Mastronardi] with any meaningful explanation or verifiable or other just cause for its failure or refusal to deliver any of the [tomatoes] [Mastronardi] contracted to

purchase from [SunSelect]." <u>Id.</u> at ¶ 44. Fifth, SunSelect "failed or refused to deliver any of the [tomatoes] [Mastronardi] contracted to purchase from [SunSelect]." <u>Id.</u> at 42. Sixth, SunSelect intentionally made false and misleading statements to Mastronardi, and Mastronardi relied on those false and misleading statements when it entered into the Agreement and fulfilled its obligations to SunSelect under the Agreement. <u>Id.</u> at ¶ 47-61.

Based on the foregoing allegations, Mastronardi pleaded three PACA claims for relief against SunSelect. <u>See</u> Doc. No. 1. The three claims are: (1) "Unfair Trade Practice – Failure to Deliver Produce" under § 499b(2) of PACA; (2) "Unfair Trade Practice – Make False or Misleading Statements" under § 499b(4) of PACA; and (3) "Unfair Trade Practice – Failure to Perform Specification or Duty" under § 499b(4) of PACA.

In response to Mastronardi's complaint, SunSelect filed the instant motion. In the motion, SunSelect asserts that there is another dispute between SunSelect and Mastronardi that was not discussed in Mastronardi's complaint. Specifically, SunSelect asserts that Mastronardi failed to pay for some of the tomatoes grown and delivered by SunSelect. States SunSelect, "Mastronardi consistently failed to timely pay the full amount for the [tomatoes] . . . as required under the Agreement" and "despite [SunSelect's] repeated efforts, SunSelect has remained to be unable to collect the amounts Mastronardi owes it under the terms of the Agreement." <u>See</u> Doc. No. 9, at 10:7-10.[5]

Approximately three weeks after Mastronardi filed suit against SunSelect, SunSelect unilaterally referred to arbitration the dispute over Mastronardi's alleged failure to pay for the tomatoes. <u>See</u> Doc. No. 9-1. Then, four days later, SunSelect filed the instant motion to dismiss or stay this case pending resolution of the arbitration. <u>See</u> Doc. No. 9.

## II. SUNSELECT'S MOTION

### 1. SunSelect's arguments

SunSelect argues in its motion and reply that this case should be dismissed or stayed because Mastronardi is required under the Agreement to arbitrate its claims. SunSelect bases this

---

[5] This order's citations to page numbers of the parties' briefs refer to the CM/ECF page number displayed on the top of the page.

argument on the following points.

First, the Agreement states that a dispute between SunSelect and Mastronardi must be referred to arbitration if PACA is not applicable. PACA is not applicable to Mastronardi's claims for two reasons. One, Mastronardi's claims arise from SunSelect's alleged breach of the Agreement or, in other words, Mastronardi's claims are really just common law breach of contract claims, not PACA claims. Two, PACA provides a private right of action only to PACA trust beneficiaries for trust claims, not unfair conduct claims, and Mastronardi is not a PACA trust beneficiary and has not pleaded trust claims.

Second, assuming arguendo that PACA provides a private right of action to non-trust beneficiaries for unfair conduct claims, Mastronardi's claims are not viable unfair conduct claims under PACA because Mastronardi is the purchaser and SunSelect is the grower and seller. Unfair conduct claims can only be brought by a grower or seller, not a purchaser.

Third, assuming arguendo that Mastronardi's claims are viable unfair conduct claims under PACA, this case should be stayed on grounds of judicial economy because referring the dispute to arbitration will better preserve the resources of the Court and parties.

**2.      Mastronardi's arguments**

Mastronardi argues in its opposition that its claims against SunSelect should be neither dismissed nor stayed. Mastronardi bases this argument on the following points.

First, PACA provides a private right of action to a person wronged by a dealer's unfair conduct, and SunSelect is a dealer who wronged Mastronardi. Therefore, Mastronardi's claims against SunSelect are viable unfair conduct claims under PACA, thereby making PACA applicable to Mastronardi's claims.

Second, the Agreement expressly states that disputes shall be referred to arbitration only if PACA is not applicable. Because PACA is applicable to Mastronardi's claims, Mastronardi's claims are not subject to arbitration.

## III. DISCUSSION

### 1. The Federal Arbitration Act

When parties agree in writing to arbitrate their disputes in "a contract evidencing a transaction involving commerce," then the agreement is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2; see also Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). Section 2 of the FAA generally upholds the validity, irrevocability, and enforceability of arbitration agreements:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

If the parties enter into a valid arbitration agreement, then § 4 of the FAA authorizes the United States district courts to "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement" if one of the parties fails, neglects, or refuses to arbitrate. See id. at § 4.

If a dispute between the parties is brought in any of the courts of the United States and the dispute is subject to arbitration pursuant to the parties' arbitration agreement, then § 3 of the FAA directs the court to, on application of one of the parties, stay the trial on the lawsuit "until such arbitration has been had in accordance with the terms of the agreement." Id. at § 3; see also Munro v. Univ. of S. Cal., 896 F.3d 1088, 1091 (9th Cir. 2018).

Here, the written Agreement between SunSelect and Mastronardi evidences a transaction that involves commerce. Further, the Agreement contains an arbitration agreement. Therefore, the arbitration agreement is subject to the FAA. But this alone does not mean that all disputes between SunSelect and Mastronardi are subject to arbitration.

The FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis added). Therefore, the court's role is limited to answering the

6

following two questions: (1) is the arbitration agreement valid; and (2) does the arbitration agreement encompass the dispute at issue. See Munro, 896 F.3d at 1091; Chiron, 207 F.3d at 1130–31. "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." Munro, 896 F.3d at 1091 (citations omitted). Here, SunSelect and Mastronardi do not dispute that the Agreement is valid. Therefore, the primary issue before the Court is whether the arbitration agreement encompasses Mastronardi's claims. See Chiron, 207 F.3d at 1131 ("Because the parties do not challenge the validity of the Agreement, the FAA restricts our review to deciding only whether the dispute is arbitrable, that is, whether it falls within the scope of the parties' agreement to arbitrate.").

To determine whether the arbitration agreement encompasses Mastronardi's claims, the Court looks first to the text of the arbitration agreement. Munro, 896 F.3d at 1092. While doing so, the Court will "look to general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1018 (9th Cir. 2016) (citations omitted); see also United States ex rel. Welch v. My Left Foot Children's Therapy, LLC, 871 F.3d 791, 796 (9th Cir. 2017). However, "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated. Arbitration under the FAA is a matter of consent, not coercion." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002) (citations omitted).

"Federal courts sitting in diversity look to the law of the forum state — here, California — when making choice of law determinations. Under California law, the parties' choice of law will govern unless section 187(2) of the Restatement (Second) of Conflict of Laws dictates a different result." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014); see also Gramercy Inv. Tr. v. Lakemont Homes Nevada, Inc., 198 Cal. App. 4th 903, 909 (2011) ("To determine the enforceability of contractual choice-of-law provisions, California courts apply the principles set forth in the Restatement Second of Conflict of Laws, which reflect a strong policy favoring enforcement of such provisions. Using this approach, the court first determines either (1) whether

the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law.") (citations omitted).

Here, the Agreement states that the "Agreement will be regulated, governed and understood according to the laws within the State of California, USA." Doc. No. 1-1 at ¶ 23. The Court finds that California has a substantial relationship to the Agreement because SunSelect has its head office in California and agreed to grow the tomatoes in California. See Doc. No. 1-1. Therefore, the Court will apply California principles of contract interpretation to the arbitration agreement. In doing so, the Court will first look to the text of the arbitration provision to determine whether SunSelect and Mastronardi intended for Mastronardi's claims to be subject to arbitration. See MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 647–48 (2003). The "clear and explicit meaning" of the arbitration agreement, interpreted in its "ordinary and popular sense," controls the Court's judicial interpretation. Id.

As quoted above, the arbitration agreement reads:

> If the chief executive officers are unable to resolve the dispute, the dispute shall be settled under procedures set out in PACA, if applicable, and if not applicable, the parties shall refer the dispute to a single arbitrator appointed under the provisions of the Commercial Arbitration Act (British Columbia), whose determination will be final and binding on the Parties.'

According to the text of the arbitration agreement, SunSelect and Mastronardi intended to limit the scope of disputes that are subject to arbitration. This intent is evidenced through the use the phrases "if applicable" and "if not applicable" when referring to PACA. When these phrases are given their effect, as they should be, see The Ratcliff Architects v. Vanir Constr. Mgmt., Inc., 88 Cal. App. 4th 595, 602 (2001), the arbitration agreement clearly intends for certain disputes to be resolved not by arbitration but through the procedures set out in PACA if PACA is applicable.

Consequently, the Court must determine whether PACA is applicable to Mastronardi's claims. If PACA is applicable, then Mastronardi's claims fall outside the scope of the arbitration agreement.

**2.      The Perishable Agricultural Commodities Act**

PACA identifies multiple categories of "unfair conduct" that are unlawful in the perishable

agricultural commodity industry.  See 7 U.S.C. § 499b.  These categories are identified in § 499b

of PACA.  The categories of unfair conduct that are relevant to Mastronardi's claims are discussed

in subsections (2) and (4) of § 499b.  These are the categories that form the basis of Mastronardi's

claims against SunSelect.  See Doc. No. 1.

Subsections (2) and (4) of § 499b state that the following "unfair conduct" is unlawful so

long as the conduct is "in or in connection with any transaction in interstate or foreign commerce":

> (2) For any dealer to reject or fail to deliver in accordance with the terms of the
> contract without reasonable cause any perishable agricultural commodity bought or
> sold or contracted to be bought, sold, or consigned in interstate or foreign
> commerce by such dealer.
>
> . . . .
>
> (4) For any commission merchant, dealer, or broker to make, for a fraudulent
> purpose, any false or misleading statement in connection with any transaction
> involving any perishable agricultural commodity which is received in interstate or
> foreign commerce by such commission merchant, or bought or sold, or contracted
> to be bought, sold, or consigned, in such commerce by such dealer, or the purchase
> or sale of which in such commerce is negotiated by such broker; or to fail or refuse
> truly and correctly to account and make full payment promptly in respect of any
> transaction in any such commodity to the person with whom such transaction is
> had; or to fail, without reasonable cause, to perform any specification or duty,
> express or implied, arising out of any undertaking in connection with any such
> transaction; or to fail to maintain the trust as required under section 499e(c) of this
> title. However, this paragraph shall not be considered to make the good faith offer,
> solicitation, payment, or receipt of collateral fees and expenses, in and of itself,
> unlawful under this chapter.

7 U.S.C. § 499b(2), (4).

PACA explicitly provides remedies for persons injured by "unfair conduct," such as the

unfair conduct identified in subsections (2) and (4).  Namely, § 499e of PACA states that "[i]f any

commission merchant, dealer, or broker violates any provision of § 499b of this title he shall be

liable to the person or persons injured thereby for the full amount of damages . . . sustained in

consequence of such violation."  Id. at § 499e(a).  Moreover, § 499e states that the aggrieved party

may pursue damages caused by unfair conduct by either (1) complaint to the Secretary of

Agriculture or (2) "suit in any court of competent jurisdiction."  Id. at § 499e(b).

Certain terms in subsections (2) and (4) are defined by PACA, including the terms "dealer," "commission merchant," and "broker." See id. at § 499a(b)(5)-(7). These terms are important here because the unfair conduct identified in subsection (2) must be conducted by a "dealer" and the unfair conduct identified in subsection (4) must be conducted by a "commission merchant, dealer, or broker." See id. at § 499b(2), (4). In other words, Mastronardi's unfair conduct claims under subsections (2) and (4) are not viable if SunSelect is neither a dealer, commission merchant, nor broker.

    (1)    <u>Whether SunSelect is a "dealer," "commission merchant," or "broker" under PACA</u>

"The first and most important step in construing a statute is the statutory language itself. We look to the text of the statute to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. If from the plain meaning of the statute congressional intent is clear, that is the end of the matter." <u>Royal Foods Co. v. RJR Holdings, Inc.</u>, 252 F.3d 1102, 1106–09 (9th Cir. 2001) (internal quotation marks omitted) (citing <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997); <u>Chevron USA v. Natural Res. Def. Council</u>, 467 U.S. 837, 842–44 (1984)); <u>see also</u> <u>In re HP Inkjet Printer Litig.</u>, 716 F.3d 1173, 1180–81 (9th Cir. 2013). This is because "[t]he preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what is says there." <u>In re HP Inkjet</u>, 716 F.3d at 1180–81. "When deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." <u>Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan</u>, 891 F.3d 839, 844–45 (9th Cir. 2018) (citations omitted).

PACA defines a "commission merchant" as:

    [A]ny person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another.

7 U.S.C. § 499a(b)(5). PACA defines a "broker" as:

    [A]ny person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on

> behalf of the vendor or the purchaser, respectively, except that no person shall be deemed to be a "broker" if such person is an independent agent negotiating sales for and on behalf of the vendor and if the only sales of such commodities negotiated by such person are sales of frozen fruits and vegetables having an invoice value not in excess of $230,000 in any calendar year.

Id. at § 499a(b)(7).

Mastronardi's allegations in the complaint and assertions in the opposition do not demonstrate that SunSelect is a broker or commission merchant. Mastronardi has not shown that SunSelect is "engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another." Id. at § 499a(b)(5). Nor has Mastronardi shown that SunSelect is "engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser." Id. at § 499a(b)(7). The Court cannot conclude that SunSelect is either a commission merchant or broker.

Thus, for Mastronardi's unfair conduct claims to be viable against SunSelect, SunSelect must be a dealer. PACA defines a "dealer" as:

> [A]ny person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce, except that (A) no producer shall be considered as a "dealer" in respect to sales of any such commodity of his own raising; (B) no person buying any such commodity solely for sale at retail shall be considered as a "dealer" until the invoice cost of his purchases of perishable agricultural commodities in any calendar year are in excess of $230,000; and (C) no person buying any commodity other than potatoes for canning and/or processing within the State where grown shall be considered a "dealer" whether or not the canned or processed product is to be shipped in interstate or foreign commerce, unless such product is frozen or packed in ice, or consists of cherries in brine, within the meaning of paragraph (4) of this section. Any person not considered as a "dealer" under clauses (A), (B), and (C) may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered a "dealer".

7 U.S.C. § 499a(b)(6). With respect to the definition's reference to "wholesale or jobbing quantities," the Secretary of Agriculture has defined "wholesale or jobbing quantities" to mean "aggregate quantities of all types of produce totaling one ton (2,000 pounds) or more in weight in any day shipped, received, or contracted to be shipped or received." 7 C.F.R. § 46.2(x).

The Ninth Circuit has ruled that the definition of "dealer" is unambiguous, and SunSelect does not argue otherwise.  See Royal Foods Co. v. RJR Holdings, Inc., 252 F.3d 1102, 1106–09 (9th Cir. 2001) (concluding that the definition of a dealer is unambiguous and can encompass restaurants).

Based on the unambiguous definition of a "dealer," the Court concludes that SunSelect is a dealer under PACA for the following two reasons.  First, SunSelect does not dispute[6] that it satisfies the initial prerequisite for being a dealer — namely, being "engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce," 7 U.S.C. § 499a(b)(6) — and the evidence suggests that SunSelect does in fact sell perishable agricultural commodities in wholesale or jobbing quantities in interstate or foreign commerce.  See Doc. No. 1-1;[7] Doc. No. 9-1; Doc. No. 11-1.

Second, SunSelect secured its PACA license shortly after the Agreement was entered into and has held the license ever since, including at the time Mastronardi filed this suit.  Thus, according to the unambiguous definition of a dealer, SunSelect is a "dealer."  Further, even assuming SunSelect falls into one of the definition's three exception clauses, such as clause (A) — which is that "no producer shall be considered as a 'dealer' in respect to sales of any such commodity of his own raising" — SunSelect would nonetheless be a dealer because it secured a PACA license.  See 7 U.S.C. § 499a(b)(6) ("Any person not considered as a 'dealer' under clauses (A), (B), and (C) may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered as a 'dealer'.") (emphasis added).

---

[6]  Mastronardi alleged that SunSelect engaged in the business of buying or selling in wholesale or jobbing quantities perishable agricultural commodities in interstate or foreign commerce.  See, e.g., Doc. No. 1 ¶ 9.  Further, Mastronardi provided the Court with a copy of the Agreement and a declaration from Mastronardi's counsel, both of which support this allegation.  See Doc. No. 1-1; Doc. No. 11-1.

[7]  Mastronardi attached a copy of the Agreement to the complaint.  See Doc. No. 1-1.  SunSelect has effectively conceded that the attached Agreement is in fact a true and correct copy of the Agreement.  See Doc. No. 9, at 6, n.2 ("In breach of the Agreement's confidentiality provision (Agreement Paragraph 21), Mastronardi filed the Agreement in the public record as Exhibit A to the Complaint. . . .  But SunSelect does not compound Mastronardi's breach by attaching yet another copy of the Agreement to this Motion.  Moreover, the discussion herein is narrowly tailored to avoid revealing any confidential information or details contained in the Agreement.  Accordingly, all citations to the Agreement are to Exhibit A to the Complaint.").

Despite this straightforward application of the definition of a dealer, SunSelect contends that growers of agricultural commodities — as opposed to purchasers and re-sellers — cannot be considered dealers because Congress never intended for PACA's unfair conduct claims to be brought against growers who sell their own produce. SunSelect also argues that a grower like itself does not become a dealer simply by securing a PACA license.

With respect to the issue of the legislative intent that SunSelect raises, it is notable that SunSelect did not cite or provide the Court with any specific legislative history. In any event, the Ninth Circuit has stated that "we need not resort to legislative history" when there is no ambiguity in the statutory language. Perlman v. Catapult Entm't, Inc., a California Corp., a/k/a Storm Sys. (In re Catapult Entm't, Inc.), 165 F.3d 747, 753 (9th Cir. 1999) (citing Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 808–09 n. 3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.")). The Ninth Circuit "will depart from this rule, if at all, only where the legislative history clearly indicates that Congress meant something other than what it said." In re Catapult Entm't, Inc., 165 F.3d at 753. It is "rare and exceptional" for an unambiguous statute to be contravened by clearly expressed legislative intent. Royal Foods, 252 F.3d at 1108. The Court has concluded that the definition of a dealer is unambiguous and applies to SunSelect. In response to SunSelect's legislative intent argument, the Court elects to look at the legislative history to determine whether it is true, as SunSelect suggests, that a contrary legislative intent is clearly expressed.

PACA was enacted in 1930 and was intended to address a problem unique to perishable agricultural commodities in that day. Farmers grew crops, and the crops would then be ordered by merchants who were often located hundreds or thousands of miles away in large cities. The farmer would cause the crops to be loaded onto trucks or trains and shipped to the cities where the merchants received the crops.[8] Some merchants were dishonest. A dishonest merchant would inspect the crops upon arrival and falsely tell the farmer or shipper via telegraph that some of the

---

[8] See, e.g., 71 Cong. Rec. 2235 (1929) (statement of Sen. Harris) (discussing the "commission merchants in New York, Chicago, and other large cities").

crops were in bad shape when, in fact, the crops were fine.[9]  Alternatively, a dishonest merchant would falsely tell the farmer or shipper that the market price for the crops was less than what it actually was, and based on this false representation — which the farmer was not able to verify — the merchant would offer to purchase the crops from the farmer at less-than-fair prices.[10]  Alternatively, a merchant would place an order for crops from the farmer, but if the market price for the crops declined while the crops were being shipped from the farmer to the merchant, then the merchant would refuse to receive the crops, falsely claiming that the crops were damaged or different from what the merchant had ordered.[11]

These unfair practices of the merchant placed the farmer in a difficult position: if the farmer rejected the merchant's unfair terms, then the farmer's crops would be left sitting in a faraway city, soon to spoil, and unsold.[12]  As a result, the farmer was often coerced into accepting the unfair terms, selling the crops to the merchant for a fraction of what they were truly worth.[13]  After the farmer agreed to sell the crops, the dishonest merchant would oftentimes sell the crops at a considerably higher amount than the amount the farmer agreed to sell the crops at.  For example, the merchant would sell at full market price the crops that the merchant had previously and falsely told the farmer were unfit for sale and, on that pretense, purchased at a discount from the farmer.

---

[9] See, e.g., id. at 2200 (statement of Sen. Heflin) ("I have in mind an instance where a carload of tomatoes arrived in Chicago, and the consignee wired back that the goods were in bad condition and he could not pay for them.  The shipper wired the Government inspector to go around and look at the goods; he went around and inspected the carload of tomatoes and found them in good condition, and he compelled the consignee to pay the full amount agreed upon."); see also Perishable Agricultural Commodities: Hearing on H.R. 5663 Before the Comm. On Agriculture, 71st Cong. 21 (1930) (statement of Mr. Barnes of Grand Forks, North Dakota).

[10] See, e.g., 71 Cong. Rec. 2200-01 (1929) (statement of Sen. Fletcher) ("Or suppose he is told that the commission merchant only got so much for the product, whereas and as a matter of fact, the prices were very much higher, were quoted higher, and supposed to be higher and were actually higher than reported?  The commission merchant reports back that he received only $1 for that for which he really received $1.50.  What protection is it to the shipper a thousand miles away to be at the mercy, as he is, of this salesman or jobber or what not in the central market?").

[11] See, e.g., Perishable Agricultural Commodities: Hearing on H.R. 5663 Before the Comm. On Agriculture, 71st Cong. 20 (1930) (statement of Mr. Perham, President of The Perham Fruit Co., of Yakima, Washington).

[12] See, e.g., 71 Cong. Rec. 2202 (1929) (statement of Sen. Borah) ("If the raiser of fruit ships a carload of stuff from the State of Washington to Omaha, I contend that there is now no means by which he can be protected in case his stuff is unfairly rejected.  Suppose he ships his carload of fruit, and when it reaches Omaha the commission merchant telegraphs him that it is unfit, it is undesirable, but he will allow him so much.  The raiser of that fruit is absolutely at the mercy of the commission merchant.  He cannot employ a lawyer.  He cannot employ someone to go to Omaha and investigate the situation.  He has no means by which to protect himself.").

[13] See, e.g., Perishable Agricultural Commodities: Hearing on H.R. 5663 Before the Comm. On Agriculture, 71st Cong. 21 (1930) (statement of Mr. Barnes of Grand Forks, North Dakota).

Sometimes the merchant would even fail to pay the farmer for the crops,[14] knowing that the farmer would be hard-pressed to bring expensive legal action against the merchant who was hundreds or thousands of miles away.  Moreover, if the farmer did bring legal action, then the farmer's suit could take years to get to trial and cost the farmer far more in fees than the damages suffered.[15] Not only was the farmer injured by these unfair practices, but the honest merchants were injured because they did not profit as much as the dishonest ones.[16]

In response to these and related unfair practices in the perishable agricultural commodities industry, Congress passed PACA in 1930.[17]  Like the current version of PACA, the 1930 version required commission merchants, brokers, and dealers to obtain a license from the United States Department of Agriculture ("USDA").[18]  The idea behind the licensing requirement was to dissuade the merchants, brokers, and dealers from engaging in unfair conduct because if they did

---

[14]  See, e.g., 71 Cong. Rec. 2229 (1929) (statement of Sen. King) ("Many wholesale merchants and brokers ship their goods to retailers in distant States, and the latter are not always honest, and not infrequently violate their contracts and fail to make payments for the merchandise even after the same has been sold.")

[15]  See, e.g., Perishable Agricultural Commodities: Hearing on H.R. 5663 Before the Comm. On Agriculture, 71st Cong. 20 (1930) (statement of Mr. Perham, President of The Perham Fruit Co., of Yakima, Washington); id. at 26 (statement of Rep. John. W. Summers) ("A shipper cannot afford to go into court two or three thousand miles away, with a jury trial, employ an attorney, and all of that sort of thing, over $150, $200, or $800; and it is that sort of thing we are trying to get away from."); H.R. Rep. No. 1041, at 2 (1930) ("While recourse can be had to the courts for most, if not all, of the practices declared to be unfair by this bill, litigation is but seldom resorted to except in cases involving large sums.  Litigation is frequently unsatisfactory as a practical matter.  The commodities are highly perishable.  In case of dispute immediate disposition must be made of them.  Buyers and sellers are often hundreds and frequently thousands of miles apart.  In such circumstances litigation is expensive.  The farmer, small shipper, or the manager of a small cooperative association does not have the time or money to conduct the necessary investigation for successful prosecution.  Long delays occur in the adjudication of complaints, and frequently judgment cannot be collected when awarded.  In many cases the amount of the loss suffered from the unfair practice does not warrant the cost of litigation, but taken in the aggregate, these losses are a tremendous burden upon these industries.").

[16]  See, e.g., Perishable Agricultural Commodities: Hearing on H.R. 5663 Before the Comm. On Agriculture, 71st Cong. 20 (1930) (statement of Mr. Perham, President of The Perham Fruit Co., of Yakima, Washington).

[17]  See, e.g., H.R. Rep. No. 1041, at 1 (1930) ("After rather extensive hearings it was developed before the committee that each year the shippers and growers of such commodities suffer severe losses due to unfair practices on the part of commission merchants, dealers, and brokers.  The practice on the part of irresponsible dealers of rejecting purchases of such commodities on a declining market is reported to the committee as causing heavy losses to the grower and shipper annually, particularly in the fruit and vegetable industry."); 71 Cong. Rec. 2232 (1929) (statement of Sen. Copeland) ("The purpose of this bill, as I understand, is to do away with dishonest trading, to do away with fraudulent acts which are familiar to everybody who knows anything about the business.  That is exactly what is written in the bill, that the commission merchant, dealer, or broker without a license cannot transact business; that any person desiring to have a license shall make application to the Secretary, and the Secretary may by regulation prescribe the information to be contained in such application.") (internal quotation marks omitted); id. at 2235 (statement of Sen. Harris) ("When a farmer ships his fruits, vegetables, melons, and other farm products to commission merchants in the cities, this law, if passed, will make them deal honestly or they will be punished and put out of business. . . .  This special session of Congress was called to give farm relief, and I believe that this should include everything that will help the farmers.").

[18]  See Perishable Agricultural Commodities Act, ch. 436, secs. 3-4, 46 Stat. 531, 533 (1930).

engage in unfair conduct, then the aggrieved party could report the unfair conduct to the Secretary of Agriculture, who in turn could issue a reparation order to the wrongdoer and also suspend or revoke the wrongdoer's license.[19]  If the merchant, broker, or dealer was stripped of their PACA license, then the wrongdoer's business would suffer because, in part, the wrongdoer would be viewed as untrustworthy.[20]  Thus, the licensing requirement was intended to serve as a deterrent of unfair conduct.[21]

Like the current version, the 1930 version of PACA did not limit the aggrieved party's remedies to only filing a complaint with the Secretary of Agriculture.  Rather, the 1930 version expressly stated that an aggrieved party could take its grievance against the wrongdoer into the courts.[22]  The remedy of bringing suit under PACA was in addition to any other claims available to the aggrieved party at common law or by statute, such as claims for breach of contract or fraud.[23]

Based on this legislative history, it can be said that PACA's original drafters were primarily concerned with protecting the growers from the unfair conduct of the merchants and buyers.[24]  But it cannot be said that the original drafters clearly intended for PACA's unfair conduct claims to be available only to the growers and not available to the merchants and buyers. SunSelect has not provided the Court with any specific legislative history suggesting otherwise. In fact, in harmony with the text of PACA's statutory scheme for unfair conduct claims, see 7

---

[19]  See id. at secs. 6-8, 46 Stat. at 534-35.

[20]  See, e.g., 71 Cong. Rec. 2202 (1929) (statement of Sen. Borah) ("The design and purpose of the bill is to take away the right to do business of commission merchants who are unwilling to deal fairly and honestly with those who are shipping them their stuff."); id. at 2235 (statement of Sen. Harris) ("When a farmer ships his fruits, vegetables, melons, and other farm products to commission merchants in the cities, this law, if passed, will make them deal honestly or they will be punished and put out of business.").

[21]  See, e.g., id. at 2203 (statement of Sen. Borah) ("The responsible firm takes out a license; it is just as much interested in avoiding any possibility of having its license canceled as it is in any other matter in connection with the business.  As a leading commission merchant said to me, it really would compel those who are careless to be more careful in the matter of rejecting products when they come into the market.  The fear of having a license canceled would of itself be in injunction to act in accordance with the facts.").

[22]  See Perishable Agricultural Commodities Act, ch. 436, sec. 5(b), 46 Stat. 531, 534 (1930) ("Such liability may be enforced either (1) by complaint to the Secretary as hereinafter provided, or (2) by suit in any court of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this Act are in addition to such remedies.").

[23]  Id.

[24]  See, e.g., 71 Cong. Rec. 2226 (1929) (statement of Sen. Smith) ("I imagine the object of this bill is not to embarrass the producer but to guarantee a square deal to him by the man who purchases his products and who, under the terms of the bill, is required to make a correct report as to the condition of the products when they arrive.").

1  U.S.C. §§ 499b, 499e, some of PACA's legislative history shows that the some of the original

2  drafters intended for unfair conduct claims to be available to merchants and buyers who were

3  wronged by growers and sellers.  Two points highlight this fact.

4      First, some of the original drafters were concerned that growers and sellers — not just

5  merchants and buyers — engaged in unfair conduct.  These drafters openly voiced their intention

6  that liability for unfair conduct claims should reach growers and sellers in addition to merchants

7  and buyers.[25]

8      Second, like the current definition of a dealer, the original definition of a dealer — a

9  definition that had been debated and consciously crafted by the original drafters[26] — stated that a

10  person who sold agricultural commodities of its own raising would be considered a dealer if the

---

[25] See, e.g., S. Rep. No. 6 (1929) (statement of Arthur M. Hyde, U.S. Secretary of Agriculture) ("The bill provides for the licensing of commission merchants that receive fresh fruits and vegetables of any kind in interstate or foreign commerce, brokers engaged in the business of negotiating sales and purchases in such commerce of fresh fruits and vegetables, and dealers buying and selling other than at retail any such commodities in such commerce, including producers selling and retailers buying such commodities in carload quantities or the equivalent thereof.") (emphasis added); H.R. Rep. No. 1041, at 2 (1930) ("Unfair practice has also been charged against the seller of such perishable commodities.  Many instances have arisen where the shipper, after having previously signed a contract to deliver the commodity on a certain date in the future, fails to do so when delivery would be to his disadvantage and he sells to someone else at a higher price.  Such a practice at the point of shipment is as unfair as the unjustifiable rejection of shipments in the receiving markets.  The bill treats buyer and seller in interstate transactions of perishable commodities alike with respect to the unwarranted repudiation of contracts."); 71 Cong. Rec. 2225 (1929) (statement of Sen. Copeland) ("[T]here would be a decided lack of mutuality there.  The commission merchant, for instance, in New York would be liable to all the penalties of the bill, should it become a law, while the person shipping would have no responsibility under it.  As I have before stated, many times perishable commodities which are received in New York are received in bad condition because they are badly packed; they are not sent as they should be; they are damaged in transit and are received in a condition which makes them unsalable.  The producer knows that when he ships those products they are all right, and, of course, he has a grievance; but the commission merchant in New York, who is licensed, knows that if he takes any chances of that sort of thing from an unlicensed person, the unlicensed person in the country has no penalty to pay.  All the burden is then placed on the commission merchant in New York."); id. at 2227 (statement of Sen. Borah) ("[B]ut let me say in this connection that while this bill is designed primarily to protect the producer, yet nevertheless there is another party in the transaction, and that is the commission merchant or the dealer.  They are entitled to some consideration; and it was for that reason that the bill was drawn as it was, so that there would be a parity of obligation between them."); id. (statement of Sen. Copeland) (referring to the "absolutely irresponsible" and "perfectly irresponsible individual" residing "in the country" who ships "unsuitable" crops to the merchant, and calling it a "lack of mutuality" to subject the merchant but not the grower and shipper to PACA); id. at 2230 (statement of Sen. Walsh) (". . . . I would like to subject anyone who makes a fraudulent statement about these matters to the penalties of the law, so I am going to suggest that . . . we should strike out the words 'commission merchant, dealer, or broker' and insert the word 'person,' so it would read: 'for any person to make, for a fraudulent purpose, any false or misleading statement,' and so forth."); id. (Sen.'s Walsh, Borah, and Copeland proposing that the scope of persons and entities liable for unfair conduct be expanded from just commission merchants, brokers, and dealers to also include "persons," "producers," and "shippers."); id. at 2232 (Sen. Copeland discussing the "character of injury . . . the producer might inflict upon the commission merchant").

[26] See, e.g., 71 Cong. Rec. 2195-97 (1929) (senators debating the scope of the term "dealer," discussing whether the term should encompass a farmer who sells crops of his or her own raising or a horticulturist or a person who sells one carload as opposed to many carloads of perishable products); id. at 2225 (Sen. Walsh of Montana proposing to exclude from the definition of "dealer" the "producers selling or shipping products of their own raising.").

person had secured a PACA license, regardless of whether the person fell within the "own raising" exception.[27] Moreover, like the current version of PACA, the original version stated that dealers could be liable for failing "to deliver in accordance with the terms of the contract without reasonable cause any perishable agricultural commodity bought or sold or contracted to be bought or sold in interstate or foreign commerce by such dealer," or making "any false or misleading statement concerning the condition, quality, quantity, or disposition of, or the condition of the market for, any perishable agricultural commodity which is . . . bought or sold or contracted to be bought or sold in such commerce by such dealer."[28] These practices deal with selling, delivering, and representing the quality and quantity of perishable agricultural commodities, all of which are practices that are routinely engaged in by growers and sellers. Further, Congress could have specified that license-holding growers are excluded from the definition of a dealer, but Congress did not do so in 1930 and has not done so in the eighty-eight years since. See Royal Foods, 252 F.3d at 1107 (holding that restaurants can be dealers under PACA because, in part, Congress did not expressly exclude restaurants from the definition of a dealer like it did with certain produce processors). Thus, in light of the foregoing legislative history, the Court rejects SunSelect's legislative intent argument. The Court is unaware of a clearly expressed legislative intent that demonstrates that a buyer like Mastronardi cannot bring an unfair conduct claim against a grower like SunSelect.

The Court also notes that a variation of SunSelect's legislative intent argument has been implicitly rejected by multiple circuit courts, including the Ninth and Third Circuits. These circuits held that a restaurant can be a dealer under PACA, and they made this holding by applying the unambiguous definition of a dealer to restaurants despite the fact that the original drafters of PACA never openly discussed whether PACA should apply to restaurants. See Royal Foods, 252

---

[27] See Perishable Agricultural Commodities Act, ch. 436, sec. 1, 46 Stat. 531, 532 (1930); see also H.R. Rep. No. 1041, at 3 (1930) ("The bill does not apply to producers selling such commodities of their own raising. . . . However, a producer or retailer who is not required by the bill to obtain a license may elect to take a license if he so desires and while the license is in effect he must operate within the provisions of the act."); cf. 7 U.S.C. § 499a(b)(6) ("Any person not considered as a 'dealer' under clauses (A), (B), and (C) may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered as a 'dealer'.").

[28] Perishable Agricultural Commodities Act, ch. 436, sec. 2, 46 Stat. 531, 532-33 (1930).

F.3d at 1104; <u>In re Magic Restaurants, Inc.</u>, 205 F.3d 108, 110 (3d Cir. 2000). The Ninth and

Third Circuits applied the unambiguous definition of a dealer to restaurants because neither circuit

found a clearly expressed legislative intent demonstrating that restaurants should not be considered

dealers. <u>See</u> <u>Royal Foods</u>, 252 F.3d at 1108; <u>In re Magic Restaurants</u>, 205 F.3d at 116. Moreover,

the Third Circuit expressly rejected the USDA's position that restaurants are not subject to PACA,

a position that the USDA had adhered to for seven decades but was at odds with the unambiguous

definition of a "dealer."[29] <u>See</u> <u>In re Magic Restaurants</u>, 205 F.3d at 117. Thus, these rulings from

the Ninth and Third Circuit implicitly reject SunSelect's legislative intent argument.

With respect to SunSelect's argument that a grower who sells sufficient quantities of

perishable agricultural commodities of its own raising in interstate commerce should not be

considered a dealer simply on account of having a PACA license, the Court rejects this argument.

The argument contravenes the unambiguous definition of a "dealer," as previously discussed. <u>See</u>

7 U.S.C. 499a(b)(6). Additionally, the case law cited by SunSelect to support the argument does

not at all support its argument.

In <u>Arava USA, Inc. v. Karni Familyi Farm, LLC</u>, 474 Fed. Appx. 452 (6th Cir. 2012), the

Sixth Circuit ruled that a person who has a PACA license but is not engaged in the business of

buying or selling in wholesale or jobbing quantities is not considered a dealer simply on account

of having the PACA license. <u>Id.</u> at 454. This ruling, which is perfectly consistent with the

definition of a dealer, highlights a critical distinction between the license holder in <u>Arava</u> and

SunSelect, a distinction that SunSelect ignored when discussing <u>Arava</u>. As is plainly stated in the

definition of a dealer, the initial prerequisite to being a dealer is that the person must be engaged in

the "business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary."

---

[29] SunSelect briefly argues that it is not a dealer under the USDA's "clarified" definition of dealer in 7 CFR 46.2(m). <u>See</u> Doc. No. 12 at 4:23-5:15. But like the Third Circuit did in <u>In re Magic Restaurant</u>, the Court will not defer to an agency interpretation that is contrary to the unambiguous statute. <u>In re Magic Restaurants</u>, 205 F.3d at 117; <u>see also</u> <u>Royal Foods</u>, 252 F.3d at 1109 ("Because the statute is unambiguous, we need look no further. Congress's language controls. There is no need to defer to the United States Department of Agriculture, the agency responsible for promulgating regulations under PACA. But even if we could look to agency interpretation of the statute, the USDA has not formally interpreted PACA's definition of 'dealer' in a manner that is entitled to deference.").

7 U.S.C. § 499a(b)(6).  But the license holder in <u>Arava</u>, unlike SunSelect, did not meet this initial prerequisite.  For that reason, the Sixth Circuit ruled that the person was not a dealer, regardless of whether the person had a PACA license.  <u>Arava</u>, 474 Fed. Appx. at 454.  Here, SunSelect meets the initial prerequisite of buying or selling in wholesale or jobbing quantities in interstate commerce and, therefore, <u>Arava</u> does not aid SunSelect.

SunSelect also cites <u>Tomatoes Extraordinaire, Inc. v. Berkley</u>, 214 Cal. App. 4th 317 (2013) and <u>Bankwagon Brokerage, Inc. v. Mafolie Foods Co.</u>, 168 F. Supp. 2d 506 (D.V.I. 2001).  However, like <u>Arava</u>, these decisions addressed the issue of whether a person meets the initial prerequisite of being engaged in the business of buying or selling in wholesale or jobbing quantities in interstate or foreign commerce.  Thus, these decisions also do not aid SunSelect.

    2.    <u>PACA trust</u>

SunSelect argues that PACA is not applicable to Mastronardi's claims because Mastronardi is not a PACA trust beneficiary and PACA claims can only be brought by a PACA trust beneficiary.  The Court rejects this argument because it is a misstatement of the law.  PACA's statutory scheme for trust claims — which is provided for in § 499e(c) of PACA and was added to PACA in 1984 — has not abdicated PACA's statutory scheme for unfair conduct claims.  <u>See</u> 7 U.S.C. § 499b; <u>cf.</u> <u>id</u> at § 499e(c).  Further, the statutory scheme for unfair conduct claims does not require such claims to be brought by a trust beneficiary.  Therefore, SunSelect's argument is unsound.

Thus, for all the forgoing reasons, the Court concludes that SunSelect is a dealer under PACA and Mastronardi's unfair conduct claims are viable under PACA.  Consequently, PACA is applicable to Mastronardi's claims which, in turn, are not subject to the arbitration agreement.

**3.    Judicial economy**

SunSelect argues that even if Mastronardi's unfair conduct claims are viable under PACA, the Court should exercise its discretion and stay this lawsuit because there is a pending arbitration between SunSelect and Mastronardi and staying this lawsuit pending resolution of the arbitration will preserve the resources of the Court and the parties.  The Court rejects this argument because Mastronardi's claims are not subject to the arbitration agreement and Mastronardi does not wish to

arbitrate its claims at this time.  Cf. <u>Munro</u>, 896 F.3d 1088 at 1092 (stating that the court cannot "compel arbitration in the absence of an agreement to arbitrate" because "to do so would be to defeat 'the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms'"); <u>id.</u> ("The FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'").

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. SunSelect's motion to dismiss or stay this case pending arbitration is DENIED;

2. SunSelect shall have fourteen days from the date of this order to file an answer to Mastronardi's complaint.

IT IS SO ORDERED.

Dated:   October 19, 2018      _____

SENIOR  DISTRICT  JUDGE