**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MASTRONARDI INTERNATIONAL LIMITED,**<br><br>               **Plaintiff,**<br><br>        **v.**<br><br>**SUNSELECT PRODUCE (CALIFORNIA), INC.,**<br><br>               **Defendant.** | **CASE NO. 1:18-cv-00737-AWI-JLT**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS**<br><br>(Doc. No. 22) |

   This is a lawsuit about a business dispute between a tomato grower and a tomato merchant. The grower is SunSelect Produce (California), Inc. ("SunSelect") and the merchant is Mastronardi International Limited ("Mastronardi"). SunSelect and Mastronardi entered into a written agreement wherein SunSelect would grow tomatoes exclusively for Mastronardi and Mastronardi would purchase the tomatoes from SunSelect. After the agreement was entered into, the parties quarreled about each other's performance or lack thereof under the agreement. Mastronardi initiated this lawsuit and filed multiple claims against SunSelect. In response, SunSelect filed multiple counterclaims against Mastronardi. Now before the Court is Mastronardi's motion to dismiss SunSelect's counterclaims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. See Doc. No. 22.

# I.  Background[1]

   Mastronardi approached SunSelect in 2016 and proposed a deal wherein SunSelect would grow piccolo tomatoes exclusively for Mastronardi and Mastronardi would buy the tomatoes. One of the terms of the proposed deal was unusual to SunSelect, but Mastronardi pitched the unusual

---

[1]  The facts in the background come from the factual allegations in SunSelect's counterclaim, Doc. No. 20, which the Court construes as true. See Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1019 (9th Cir. 2002).

term as a win-win for both companies. The unusual term was that the tomatoes would be sold by SunSelect to Mastronardi by the kilogram (as opposed to by the box) based on the weight of the tomatoes at the time the tomatoes were delivered to Mastronardi at SunSelect's greenhouse (as opposed to at the time the tomatoes arrived at Mastronardi's warehouse after shipment). This term was unusual to SunSelect because normally a tomato grower sells and is paid for tomatoes by the box, not by the kilogram, based on the weight of the tomatoes at the time the tomatoes arrive at the buyer's warehouse after shipment, not at the time prior to shipment.

This unusual term was consequential for at least two reasons. First, a box of tomatoes usually contains a certain amount of "overpack," which is the weight of tomatoes that slightly exceeds the box's stated weight. For example, a box of tomatoes might state that it contains 1 kilogram of tomatoes, when the box actually contains 1.1 kilograms of tomatoes due to overpack. Second, when tomatoes are shipped to the buyer, the tomatoes in the box are susceptible to "shrink," which is the natural loss of weight of the tomatoes during the shipment. For example, a box of tomatoes might weigh 1.2 kilograms prior to shipment but weigh only 1.1 kilograms upon arriving at the buyer's warehouse. So in light of these consequences, Mastronardi's unusual proposed term meant that the weight of the tomatoes sold to Mastronardi would be the actual weight of the tomatoes, which would include any overpack, before any shrink could occur during shipment. Consequently, SunSelect would be paid for any overpack and Mastronardi would take the risk of any shrink that occurred during shipment.

When Mastronardi proposed the deal to SunSelect, Mastronardi made the following representations to SunSelect: first, Mastronardi had exclusive rights to grow piccolo tomatoes in commercial quantities; second, Mastronardi had specialized knowledge of piccolo tomatoes' expected crop yield; and third, the expected yield was 35 kg/m2 in a crop year. SunSelect relied on these representations and entered into the written agreement with Mastronardi.

Pursuant to the agreement, SunSelect began growing the tomatoes and making deliveries of the tomatoes to Mastronardi at SunSelect's greenhouse. After the deliveries, SunSelect issued invoices to Mastronardi. In response to the invoices, however, Mastronardi told SunSelect that Mastronardi would not pay the full purchase price under the agreement because Mastronardi

2

would not pay for overpack. Consequently, Mastronardi failed to pay the full amount owed under the agreement, and as of June 19, 2018, Mastronardi owed SunSelect $125,000 under the agreement. Due to Mastronardi's failure to pay the full amount owed, SunSelect stopped growing the tomatoes.

Mastronardi initiated this lawsuit and filed several claims against SunSelect. In response, SunSelect filed the following counterclaims against Mastronardi: (1) declaratory relief validating a trust claim under the Perishable Agricultural Commodities Act ("PACA"); (2) enforcement of payment from the PACA trust assets; (3) trade secret misappropriation and disclosure under the Defendant Trade Secrets Act ("DTSA"); (4) trade secret misappropriation and disclosure under California's Uniform Trade Secrets Act ("CUTSA"); (5) failure to pay promptly under PACA; (6) false and misleading statements under PACA; (7) an award of attorney's fees under DTSA, CUTSA, the PACA trust provisions, and the agreement; and (8) declaratory judgment under the Federal Declaratory Judgment Act. Mastronardi then moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss all of SunSelect's counterclaims except the Declaratory Judgement Act claim.

## II. Legal Standard

### 1. Rule 12(b)(1) and subject-matter jurisdiction.

Under Rule 12(b)(1), a claim will be dismissed if the federal court lacks subject-matter jurisdiction over the claim. Fed. Rule Civ. Proc. 12(b)(1). Federal courts are of limited jurisdiction, having subject-matter jurisdiction only over matters authorized by the Constitution and Congress. See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); A–Z Intern. v. Phillips, 323 F.3d 1141, 1145 (9th Cir. 2003). Congress has vested federal courts with "federal question" subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. When a federal court's subject-matter jurisdiction is challenged, the burden is on the party who invoked the court's jurisdiction to establish subject-matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

3

In an attempt to curtail "drive-by jurisdictional rulings," the Supreme Court in <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 511 (2006), advised courts to be cognizant of the "subject-matter jurisdiction / ingredient-of-claim-for-relief dichotomy" so as not to "erroneously conflate[]" subject-matter jurisdiction with a plaintiff's "need and ability to prove the defendant bound by the federal law asserted as the predicate for relief — a merits-related determination." <u>Arbaugh</u>, 546 U.S. at 511 (2006) (citations omitted). To that end, a district court must ensure that a jurisdictional ruling is not made upon a "provision that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the courts." <u>Id.</u> at 515 (citations omitted).

**2.      Rule 12(b)(6) and failure to state a claim.**

Under Rule 12(b)(6), a claim may be dismissed if the claim fails "to state a claim upon which relief can be granted." Fed. Rule Civ. Proc. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on claim's lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. <u>Conservation Force v. Salazar</u>, 646 F.3d 1240, 1242 (9th Cir. 2011); <u>Johnson v. Riverside Healthcare Sys.</u>, 534 F.3d 1116, 1121 (9th Cir. 2008). In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. <u>Faulkner v. ADT Sec. Servs.</u>, 706 F.3d 1017, 1019 (9th Cir. 2013). However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>Wilson v. Hewlett-Packard Co.</u>, 668 F.3d 1136, 1145 n.4 (9th Cir. 2012); <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001). To avoid a dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 570 (2007). The Ninth Circuit has distilled the following principles from <u>Iqbal</u> and <u>Twombly</u>: (1)

to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice. Dichter-Mad Family Partners, LLP v. United States, 709 F.3d 749, 761 (9th Cir. 2013). If a motion to dismiss is granted, then the "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Henry A. v. Willden, 678 F.3d 991, 1005 (9th Cir. 2012).

## III. Discussion

**1.     SunSelect's standing to maintain claims arising from the unpaid invoices.**

SunSelect's PACA trust claims and PACA prompt payment claim are based on the allegations that SunSelect delivered tomatoes to Mastronardi pursuant to the agreement, SunSelect requested payment from Mastronardi for the tomatoes, and Mastronardi refused to fully pay the amount owed under the agreement. Mastronardi argues that the Court lacks subject-matter jurisdiction over the trust and prompt payment claims because SunSelect lacks standing to maintain those claims. According to Mastronardi, SunSelect assigned its interest in the invoices to a third-party, Oppenheimer and Company I, LLC ("Oppenheimer"), and Oppenheimer paid SunSelect for the interest. This means, according to Mastronardi, that SunSelect no longer has an injury under the claims.

"Standing is the determination of whether a specific person is the proper party to bring a matter to the court for adjudication." Erwin Chemerinsky, Federal Jurisdiction 55 (7th ed. 2016). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan, 504 U.S. at 560. Therefore, "[s]tanding under Article III of the

Constitution is a constitutional limitation on a court's subject matter jurisdiction" and is a "true jurisdictional question . . . properly addressed in a Rule 12(b)(1) motion." Norkunas v. Wynn Las Vegas, LLC, 343 F. App'x 269, 270 (9th Cir. 2009). Standing requires three elements: "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-181 (2000) (citations omitted). The party invoking the court's jurisdiction bears the burden of establishing the elements of Article III standing. Lujan, 504 U.S. at 561.

"The existence of federal standing 'often turns on the nature and source of the claim asserted.'" Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 947 (9th Cir. 2011) (citing Warth v. Seldin, 422 U.S. 490, 500 (1975)). Here, the nature and source of SunSelect's trust and prompt payment claims is PACA and contract law. Under PACA's trust provisions, a PACA trust beneficiary has an injury for standing purposes when the beneficiary does not receive "full payment" from the holder of the agricultural commodities "of the sums owing in connection with" a contractual sale of the commodities. 7 U.S.C. § 499e(c)(2). Under PACA's prompt payment provisions, a seller of agricultural commodities has an injury for standing purposes when the seller is contractually entitled to but does not receive prompt payment from the buyer. See 7 U.S.C. §§ 499b(4), 499e(a). Federal regulations determine what constitutes "prompt payment" under PACA. See, e.g., 7 C.F.R. § 46.2(aa)(5). Under contract principles, an assignment of a contractual right "carries with it all the rights of the assignor" and "[o]nce a claim has been assigned, the assignee is the owner and has the right to sue on it" and "the assignor lacks standing to sue on the claim." Johnson v. Cty. of Fresno, 111 Cal. App. 4th 1087, 1096 (2003) (emphasis added); see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n, 731 F.2d 112, 125 (2d Cir. 1984) ("An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor.") (emphasis added). Interests in PACA

6

trusts, like interests in contracts, are assignable. <u>All. Shippers, Inc. v. Guarracino (In re Guarracino)</u>, 575 B.R. 298, 310 (Bankr. D.N.J. 2017).

Here Mastronardi wages a factual attack, as opposed to a facial attack, on the Court's subject-matter jurisdiction over SunSelect's trust and prompt payment claims. Whereas a facial attack on the court's subject-matter jurisdiction "accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction," a factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." <u>Leite v. Crane Co.</u>, 749 F.3d 1117, 1121 (9th Cir. 2014) (citations omitted). "Only upon a factual attack does a plaintiff have an affirmative obligation to support jurisdictional allegations with proof." <u>NewGen, LLC v. Safe Cig, LLC</u>, 840 F.3d 606, 614 (9th Cir. 2016). "In judging this evidentiary attack, the trial court necessarily assumes a different role than in a proceeding to resolve a 12(b)(1) motion based on contentions that the complaint was jurisdictionally deficient on its face." <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982).

Mastronardi wages its factual attack by arguing that SunSelect lacks standing because SunSelect assigned to Oppenheimer its interest in receiving payment from Mastronardi. In SunSelect's counterclaim, SunSelect never alleged that it assigned its interest in receiving payment from Mastronardi. Therefore, to support its factual attack, Mastronardi filed with the Court what appears to be (1) tomato invoices issued to Mastronardi by Oppenheimer, (2) tomato invoices issued to Mastronardi by SunSelect, and (3) written correspondence between the United States Department of Agriculture ("USDA"), Oppenheimer, and Mastronardi. As for the Oppenheimer invoices, Mastronardi claims that the invoices are for the tomatoes that SunSelect delivered to Mastronardi — or, in other words, the same tomatoes that SunSelect seeks payment for. Mastronardi points out that the language in the SunSelect invoices that states that SunSelect "assigns the right to collect the receivable under this invoice to David Oppenheimer & Company I, LLC." Doc. No. 22-1. As for the USDA correspondence, Mastronardi claims that the correspondence shows that Oppenheimer filed a complaint with the USDA over Mastronardi's failure to pay Oppenheimer, not SunSelect, for the tomatoes. According to Mastronardi, all of this

1   evidence proves that SunSelect assigned to Oppenheimer its interest in receiving payment for the

2   tomatoes and Oppenheimer paid SunSelect for the interest.

3       SunSelect contends that it still owns its interest in receiving payment from Mastronardi and

4   it never assigned the interest to Oppenheimer. SunSelect acknowledges that the SunSelect

5   invoices contain language suggesting that SunSelect assigned its interest to Oppenheimer, but

6   SunSelect claims that this language "is the result of a clerical error on a form of invoice and does

7   not reflect the actual agency relationship whereby [Oppenheimer] is SunSelect's agent (not its

8   assignee)." Doc. No. 29. In other words, SunSelect's position is that Oppenheimer is merely

9   SunSelect's agent in collecting on the invoices, not the assignee of SunSelect's interest. Despite

10  these assertions from SunSelect, SunSelect provided the Court with no evidence to support the

11  assertions.

12      Normally a claimant's failure to refute a jurisdictional factual attack with evidence would

13  be problematic because, as noted <u>supra</u>, a claimant has an "affirmative obligation to support

14  jurisdictional allegations with proof." <u>NewGen, LLC</u>, 840 F.3d at 614. But here the question of

15  SunSelect's standing to maintain its trust and prompt payment claims is intertwined with the

16  merits of those claims, and the Ninth Circuit has instructed that "where jurisdiction is so

17  intertwined with the merits that its resolution depends on the resolution of the merits, 'the trial

18  court should employ the standard applicable to a motion for summary judgment.'" <u>Careau Grp. v.</u>

19  <u>United Farm Workers of Am., AFL-CIO</u>, 940 F.2d 1291, 1293 (9th Cir. 1991) (citing <u>Augustine v.</u>

20  <u>United States</u>, 704 F.2d 1074, 1077 (9th Cir. 1983)); <u>see also</u> <u>Miller v. Lifestyle Creations, Inc.</u>,

21  993 F.2d 883 (9th Cir. 1993). This means that "the district court should only rely on Rule 12(b)(1)

22  if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of

23  action." <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 925 (11th Cir. 2003) (citations omitted).

24      "[T]he question of jurisdiction and the merits of an action will be considered intertwined

25  where a statute provides the basis for both the subject matter jurisdiction of the federal court and

26  the plaintiff's substantive claim for relief." <u>Miller</u>, 993 F.2d 883, *1 (9th Cir. 1993) (citations

27  omitted). An example where the Ninth Circuit has concluded that the merits and subject-matter

28  jurisdiction are intertwined is <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035 (9th Cir. 2004). <u>See</u>

Lycurgan, Inc. v. Jones, 688 F. App'x 442, 444 (9th Cir. 2017) (citing Safe Air as an example of intertwinement).  In Safe Air, the plaintiff sued the defendants for violating the Resource Conservation and Recovery Act ("RCRA"), a federal act that provides a right of action against those who contributed "to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  Safe Air, 373 F.3d 1038 (citing 42 U.S.C. § 6972(a)(1)(B)).  The plaintiff took the position that the defendants' disposal of grass residue violated RCRA because, in part, the grass residue was "solid waste" under RCRA.  In response, the defendants took the position that grass residue was not solid waste.  Ultimately, the trial court dismissed the plaintiff's RCRA claim for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) because, according to the trial court, grass residue did not constitute solid waste under RCRA.  On appeal, the Ninth Circuit ruled that the trial court erred by dismissing the RCRA claim on jurisdictional grounds.  The Ninth Circuit began by acknowledging that the statutory provision of RCRA that provided for the plaintiff's right of action and outlined the elements of the claim — including the solid waste element — was also responsible for vesting federal courts with subject-matter jurisdiction over the claim.  Consequently, the merits and subject-matter jurisdiction of the claim "were intertwined because, if grass residue counted as solid waste, then not only did the court have subject matter jurisdiction to hear [the plaintiff's] substantive claim, but the [defendants] were liable under the statute."  Lycurgan, 688 F. App'x at 444 (discussing Safe Air).

Similarly, here the statutory authority for SunSelect's trust and prompt payment claims — namely, PACA — is also the statutory authority that vests this Court with subject-matter jurisdiction over the claims.  Neither the claims nor the Court's subject-matter jurisdiction can be established if SunSelect fails to prove a transactional relationship.  For a trust claim, PACA's elements include an agricultural commodities transaction and "sums owing in connection with such transactions."  7 U.S.C. § 499e(c)(2).  For a prompt payment claim, PACA's elements include an agricultural commodities transaction (such as between a seller and purchaser) and the failure by the purchaser to make prompt payment to the "person with whom such transaction is had."  7 U.S.C. § 499b(4) (emphasis added).  For a failure to perform claim, PACA's elements

include an agricultural commodities transaction and a "failure to perform any specification or duty, express or implied, <u>arising out of any undertaking in connection with such transaction</u>." 7 U.S.C. § 499b(4) (emphasis added). Therefore, an element of all these claims is a transactional relationship, and the existence of this transactional relationship is necessary for the Court to be vested with subject-matter jurisdiction over the claims. <u>See</u> 7 U.S.C. § 499e(a)-(b) (vesting courts of competent jurisdiction with jurisdiction to enforce liability of PACA prompt payment and failure to perform claims); <u>id.</u> at § 499e(c)(5) (vesting federal district courts with jurisdiction over PACA trust claims).

Here Mastronardi's factual attack is directed towards the transactional relationship between SunSelect and Mastronardi — specifically focusing on whether SunSelect is still a contractual obligee under the agreement it entered into with Mastronardi. Because this issue goes to both the Court's subject-matter jurisdiction and the merits of SunSelect's PACA claims, SunSelect is entitled to "the protections of a summary judgment motion rather than the more limited protections given to a plaintiff responding to a factual attack on jurisdiction" pursuant to Rule 12(b)(1). <u>Vera v. Bureau of Indian Affairs</u>, 738 F. App'x 431, 432 (9th Cir. 2018). Therefore, the Court rejects Mastronardi's standing arguments at this Rule 12(b)(1) phase without prejudice to Mastronardi raising the arguments later in the merits phase of this lawsuit. Accordingly, SunSelect's trust and prompt payment claims will not be dismissed pursuant to Rule 12(b)(1).

To the extent that Mastronardi is arguing that SunSelect's invoice-related claims should be dismissed under Rule 12(b)(6) for lack of standing, the Court rejects the argument. Lack of Article III standing is not grounds for dismissal under Rule 12(b)(6). <u>Maya v. Centex Corp.</u>, 658 F.3d 1060, 1067 (9th Cir. 2011).

**2.** **PACA trust claims.**

Mastronardi argues that SunSelect's trust claims fail to state a claim because SunSelect failed to allege an element of the claims — namely, that SunSelect provided written notice to Mastronardi of SunSelect's intent to preserve the benefits of the trust. Mastronardi is correct that PACA requires the trust beneficiary to provide written notice of its "intent to preserve the benefits of the trust to the commission merchant, dealer, or broker." 7 U.S.C. 499e(c)(3). SunSelect

concedes that it did not provide written notice to Mastronardi, and due to this concession, SunSelect asks the Court to dismiss its trust claims without prejudice. The Court will do so.

**3. PACA prompt payment claim.**

Mastronardi argues that SunSelect's prompt payment claim fails to state a claim because PACA's prompt payment "deadlines" are only triggered if the amount owed is not disputed, and here the amount owed is disputed by Mastronardi. PACA's prompt payment provision, 7 U.S.C. 499b(4), states that it is unlawful for any commission merchant, dealer, or broker of perishable agricultural commodities to "fail or refuse truly and correctly to account and make <u>full payment promptly</u> in respect of any transaction in any such commodity to the person with whom such transaction is had." <u>Id.</u> (emphasis added). Federal regulations define the term, "full payment promptly," as payment "within 10 days after the day on which the produce is accepted" when dealing with "payment for produce purchased by a buyer." 7 C.F.R. § 46.2(aa)(5). The regulations clarify, however, that "[i]f there is a <u>dispute</u> concerning a transaction, the [regulations'] time periods for prompt payment apply only to payment of the <u>undisputed amount</u>." <u>Id.</u> at § 46.2(aa) (emphasis added).

Mastronardi takes the position that SunSelect's prompt payment claim fails to state a claim because SunSelect's own allegations establish an affirmative defense to the claim — namely, that the entire amount owed is disputed, thereby making the prompt payment deadlines inapplicable or, in other words, not triggered. The theoretical basis of Mastronardi's position is explained by Wright and Miller as follows:

> As the case law makes clear, the complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading to be used as the basis for the motion.

5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1357 (3d ed.) (cited with approval by <u>Harris v. Amgen, Inc.</u>, 770 F.3d 865, 883 (9th Cir. 2014)).

The problem with Mastronardi's position is that it is based on a false factual premise. Contrary to Mastronardi's characterization, SunSelect's allegations do not suggest that there is a

dispute over the amount owed by Mastronardi. SunSelect alleged that Mastronardi entered into

the agreement, the agreement included payment-for-delivery obligations owed by Mastronardi,

Mastronardi failed to satisfy those payment obligations, and the amount owed under the agreement

is definite:

> 124. . . . After each delivery, SunSelect issued invoices to
> Mastronardi setting out the Purchase Price owing to SunSelect
> under the Agreement.
>
> . . . .
>
> 127. Mastronardi has failed to pay amounts due and owing under
> the Agreement. As of June 19, 2018, Mastronardi had not paid
> $125,000 USD.

Doc. No. 20 at ¶¶ 124, 127. Because SunSelect's allegations do not suggest that there is a dispute

over the amount owed by Mastronardi, there is no merit at this Rule 12(b)(6) phase to

Mastronardi's contention that PACA's prompt payment deadlines have not been triggered.

Accordingly, SunSelect's prompt payment claim will not be dismissed pursuant to Rule 12(b)(6).

**4.     PACA false and misleading statement claim.**

In SunSelect's PACA false and misleading statement claim, SunSelect alleged that

Mastronardi made false and misleading representations to SunSelect about tomato yields and

pricing in order to induce SunSelect to enter into the agreement. Mastronardi argues that the claim

fails to state a claim because, first, SunSelect's counterclaim cited the incorrect statutory basis for

the claim and, second, SunSelect failed to allege a required element of the claim — namely, that

Mastronardi's representations were made for a fraudulent purpose.

As for SunSelect citing the incorrect statutory basis of the claim, SunSelect admits that the

counterclaim incorrectly cited to section 499e(c)(3) of PACA, not the correct statute, section

499b(4). Despite this error, Mastronardi obviously understands from SunSelect's allegations that

the false and misleading statement claim derives from section 499b(4), hence Mastronardi arguing

that SunSelect failed to cite section 499b(4). Therefore, SunSelect's counterclaim provided

Mastronardi with adequate notice of the false and misleading statement claim, which is precisely

why Mastronardi's argument fails. As the Ninth Circuit has stated, "[n]otice pleading requires the

plaintiff to set forth in his complaint claims for relief, not causes of action, statutes or legal theories" and a "complaint need not identify the statutory or constitutional source of the claim raised in order to survive a motion to dismiss." Alvarez v. Hill, 518 F.3d 1152, 1157 (9th Cir. 2008) (citations omitted); see also Conley v. Gibson, 355 U.S. 41, 47-48 (1957) ("The [Civil] Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."), abrogated on other grounds by Twombly, 550 U.S. 544. Therefore, SunSelect's false and misleading statement claim has not failed to state a claim simply because it cited an incorrect statute.

As for Mastronardi's argument that SunSelect failed to allege that Mastronardi's misrepresentations were made a fraudulent purpose, the Court disagrees. Mastronardi is correct that an element of a PACA false or misleading statement claim is that the statement was made for a fraudulent purpose, as is stated in section 499b(4):

> It shall be unlawful in or in connection with any transaction in interstate or foreign commerce . . . [f]or any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce . . . .

7 U.S.C. 499b(4) (emphasis added). But Mastronardi is incorrect in arguing that SunSelect failed to allege Mastronardi's fraudulent purpose. "Fraud" is defined as a "knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." Fraud, Black's Law Dictionary (11th ed. 2019) (emphasis added). Therefore, a fraudulent purpose would include "induc[ing] another to act to his or her detriment." Id. SunSelect alleged that Mastronardi's false and misleading statements were made in order to induce SunSelect to act to its detriment — that is, to enter into the agreement that Mastronardi would subsequently and deliberately breach and to plant tomatoes that would not produce the promised yield. This is demonstrated by the following allegations:

> 109. Mastronardi made a number of material representations that were reasonably relied upon by SunSelect, and which induced SunSelect to agree to the contractual terms contained in the parties' Agreement . . . . Among other things, Mastronardi made the

following representations . . . to SunSelect before and after the parties executed the Agreement:

> a. Mastronardi had exclusive rights to grow the Product in commercial quantities;
> b. Mastronardi had significant experience growing the Product in such commercial quantities, and Mastronardi had specialized knowledge regarding the Product and its characteristics including, among other things, expected crop yields;
> c. SunSelect could expect a yield of the Product of at least 35 kg/m2 for the crop year, as Mastronardi represented an anticipated yield of around 35 kg/m2 . . . ;
> d. the pricing for the Product would be based on the gross weight, per kilogram, of the Product . . . .

110. SunSelect relied on the Representations in entering into the Agreement and performing on it between planting and harvesting. Had the Representations not been made, SunSelect would not have entered into the Agreement with Mastronardi or otherwise agreed to plant and continue to grow the Product. Instead, SunSelect would have planted one of the other crop varieties that it profitably grows in the ordinary course of its business at the Facility.

112. At all material times, Mastronardi knew or ought to have known, based on its discussions with SunSelect that SunSelect was and would be relying upon Mastronardi's representations, especially given Mastronardi's expertise and allegedly exclusive rights in connection with piccolo tomatoes.

117. After entering into the Agreement, SunSelect learned that the Representations were false or materially incorrect, including because, among other things:

> a. neither Mastronardi nor its growers had ever previously achieved a yield of 35 kg/m2 for a crop year;
> b. Mastronardi would have known its growers had never previously achieved the promised yields;
> c. the actual reasonably expected yield for the Product was approximately 23-27 kg/m2 for the crop year;
> d. Mastronardi knew the actual expected yield when it told SunSelect the yield would be 52% higher than actual; and
> e. the methodology that Mastronardi ultimately sought to impose in calculating the Purchase Price was contrary to both the Packaging Representation and the express terms of the Agreement.

118. Prior to the commencement of the Agreement, and unbeknownst to SunSelect, Mastronardi decided unilaterally that it would not pay for the Product in accordance with the Packaging Representation, nor the agreed contractual terms relating to the Purchase Price contained in the Agreement . . . .

Doc. No. 20 at ¶¶ 109-10, 112, 117-18.

Because SunSelect sufficiently alleged the fraudulent purpose behind Mastronardi's false and misleading statements, the Court will not dismiss the false and misleading statement claim pursuant to Rule 12(b)(6).

**5.      Misappropriation and disclosure of trade secret claims.**

SunSelect pleaded claims for trade secret misappropriation and disclosure under both the federal Defend Trade Secrets Act ("DTSA") and California's Uniform Trade Secrets Act ("CUTSA").  In those claims, SunSelect alleged that SunSelect and Mastronardi agreed that the terms of the agreement were confidential and the agreement's pricing and acreage terms were trade secret information.  SunSelect also alleged that Mastronardi publicly filed a copy of the agreement in this lawsuit, thereby violating the parties' confidentiality and trade secret agreement. Mastronardi argues that the DTSA and CUTSA claims fail to state a claim for two reasons.  First, there is evidence proving that SunSelect failed to take reasonable measures to keep the information in the agreement confidential.  Second, SunSelect has not "pled that the information has independent economic value resulting from this secrecy."  Doc. No. 22.

A claim for trade secret misappropriation under the DTSA and CUTSA must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  <u>Alta Devices, Inc. v. LG Elecs., Inc.</u>, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citations omitted).  "The elements of misappropriation under the DTSA are similar to those under the CUTSA, except that the DTSA applies only to misappropriations that occur or continue to occur on or after its date of enactment on May 11, 2016.  <u>Id.</u> at 877 (citations omitted).  The DTSA defines a "trade secret" as "financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep . . . secret; and (B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  The CUTSA similarly defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) [d]erives independent economic value, actual or potential, from not being

generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Under the DTSA and CUTSA, "misappropriation" is defined as either (1) the "[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means," or (2) the "[d]isclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).

As for Mastronardi's argument that evidence proves that SunSelect failed to take reasonable measures to keep confidential the information in the agreement, the Court rejects the argument at this Rule 12(b)(6) phase. As the Seventh Circuit has stated, "[A] trade secret is one of the most elusive and difficult concepts in the law to define. In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." <u>Learning Curve Toys, Inc. v. PlayWood Toys, Inc.</u>, 342 F.3d 714, 723 (7th Cir. 2003) (citations omitted) (discussing Illinois Trade Secrets Act). Moreover, "whether a party claiming a trade secret undertook reasonable efforts to maintain secrecy is a question of fact, and it may be implicit in a determination that the information does not qualify as a trade secret, also a question of fact . . . ." <u>In re Providian Credit Card Cases</u>, 96 Cal. App. 4th 292, 306 (2002). Here undoubtedly there are questions of fact that bear on whether the information in the agreement was trade secret and whether SunSelect took reasonable measures to keep it confidential. Mastronardi's argument focuses on some of those questions of fact. But those questions should be answered with evidence at the summary judgment or trial phase, not now. <u>See, e.g.</u>, <u>Select Energy Servs., Inc. v. Mammoth Energy Servs., Inc.</u>, 2019 WL 1434586, at *6 (W.D. Okla. Mar. 29, 2019) ("Like the issue of trade secrets, reasonable measures are generally an issue of fact for the jury.") (DTSA case); <u>Ruby Slipper Cafe, LLC v. Belou</u>, 2019 WL 1254897, at *6 (E.D. La. Mar. 19, 2019) (DTSA case); <u>Taoglas Grp. Holdings Ltd. v. 2J Antennas USA, Corp.</u>, 2019 WL 1239302, at *6 (S.D. Cal. Mar. 18, 2019) ("Whether these measures are reasonable under the circumstances

cannot be decided at the pleading stage.") (DTSA case); <u>Auto. Data Sols., Inc. v. Directed Elecs.</u>

<u>Canada, Inc.</u>, 2018 WL 4742288, at *5 (C.D. Cal. July 16, 2018) ("Whether a trade secret owner

has taken reasonable efforts to maintain secrecy is a question of fact.") (DTSA and CUTSA case).

As for Mastronardi's argument that SunSelect failed to allege that the information in the

agreement has independent economic value resulting from its secrecy, the Court disagrees.

SunSelect alleged that the secrecy of the agreement's pricing and acreage information derives

independent economic value, as the following allegations demonstrate:

> 154. The pricing information was trade secret because if wholesale pricing is publicly disclosed, competitors can undercut SunSelect on similar tomato growing contracts.

> 158. . . . [T]he acreage required for a crop in a greenhouse is trade secret in the industry and not made public because that information indicates the resultant benefit to utilization ratio for crops under the mechanisms used in the greenhouse — the acreage benefit.

> 159. This trade secret information, and especially pricing information, provides SunSelect independent economic value, actual and potential, when it is not generally known to the public or competitors. Conversely, public disclosure of this information harms SunSelect. Mastronardi's public disclosure of the trade secrets has caused economic harm to SunSelect.

Doc. No. 20 at ¶¶ 154, 158, 159. Consequently, the Court will not dismiss the DTSA and CUTSA

claims pursuant to Rule 12(b)(6).

**6.      Attorney's fees.**

SunSelect requests attorney's fees in its counterclaim, and SunSelect alleges that the

attorney's fees are recoverable under DTSA, CUTSA, PACA's trust provisions, and the

agreement. Mastronardi argues that these statutory and contractual sources do not authorize an

award of attorney's fees to SunSelect.

As for DTSA and CUTSA, Mastronardi argues that those statutes do not authorize

attorney's fees here because SunSelect's DTSA and CUTSA claims should be dismissed, as

discussed <u>supra</u>. This argument fails because the Court is not dismissing SunSelect's DTSA and

CUTSA claims, as discussed <u>supra</u>.

As for PACA's trust provisions, Mastronardi argues that those provisions do not authorize

attorney's fees here because SunSelect's trust claims should be dismissed, as discussed <u>supra</u>.

1 Assuming without deciding that attorney's fees are authorized by PACA's trust provisions, the

2 Court agrees that SunSelect's request for attorney's fees under the trust provisions is futile and

3 immaterial because SunSelect's trust claims will be dismissed. Therefore, SunSelect's request for

4 attorney's fees under PACA's trust provisions will be stricken pursuant to Rule 12(f).

5 As for the agreement, SunSelect's request for attorney's fees is based on a specific

6 provision in the agreement that states that "Mastronardi hereby further agrees to fully indemnify

7 Grower, and to fully provide for all <u>costs</u> incurred by the Grower in enforcing this indemnity."

8 Doc. No. 1-1 at 7 (the agreement) (emphasis added); Doc. No. 20 at ¶ 190 (SunSelect's request for

9 attorney's fees quoting the agreement). Mastronardi argues that the agreement never mentions

10 "attorney's fees" and Mastronardi could find no legal authority supporting the proposition that

11 "costs" should be interpreted as including attorney's fees.

12 To determine whether the agreement authorizes the award of attorney's fees, the Court

13 must engage in contract interpretation. The agreement states that the "Agreement will be

14 regulated, governed and understood according to the laws within the State of California, USA."

15 Doc. No. 1-1 at ¶ 23. California has a substantial relationship to the agreement because SunSelect

16 has its head office in California and agreed to grow the tomatoes in California. <u>See</u> Doc. No. 1-1.

17 Therefore, the Court will apply California law and principles of contract interpretation to the

18 agreement. <u>See</u> <u>Restatement (Second) of Conflict of Laws</u> § 187.

19 California law for interpreting contracts has been summarized as follows:

20 Under statutory rules of contract interpretation, the mutual intention
of the parties at the time the contract is formed governs
21 interpretation. Such intent is to be inferred, if possible, solely from
the written provisions of the contract. The clear and explicit
22 meaning of these provisions, interpreted in their ordinary and
popular sense, unless used by the parties in a technical sense or a
23 special meaning is given to them by usage, controls judicial
interpretation. Thus, if the meaning a layperson would ascribe to
24 contract language is not ambiguous, we apply that meaning.

25

26 <u>People ex rel. Dep't of Corps. v. Speedee Oil Change Sys., Inc.</u>, 147 Cal. App. 4th 424, 429

27 (2007) (citing <u>AIU Ins. Co. v. Superior Court</u>, 51 Cal. 3d 807, 821-822 (1990)). Under California

28 law, a litigant is generally precluded from recovering attorney's fees absent an agreement or

18

statute authorizing the recovery.  <u>Nasser v. Superior Court</u>, 156 Cal. App. 3d 52, 56 (1984).

Moreover, "[c]ontracts which provide for payment of 'costs' alone <u>usually</u> do not include attorney

fees."  <u>F. Alioto Co. v. City & Cty. of San Francisco</u>, 2004 WL 45187, at *12 (Cal. Ct. App. Jan.

9, 2004) (emphasis added) (citing <u>Royster Constr. Co. v. Urban W. Communities</u>, 40 Cal. App.

4th 1158, 1170 (1995) ("A contract which provides for the payment of 'costs' alone does not

<u>usually</u> include attorney's fees.") (emphasis added)).  But a contract's language "may impliedly as

well as expressly permit recovery of attorney's fees in the event of suit to enforce the contract."

<u>Jen-Mar Const. Co. v. Brown</u>, 247 Cal. App. 2d 564, 573 (1967); <u>see also</u> <u>F. Alioto Co.</u>, 2004 WL

45187, at *12 ("And, while most attorney fee awards rest on express contractual language

providing for such fees upon suit to enforce the contract, the contract may also impliedly permit

their recovery.") (citing <u>Citizens Suburban Co. v. Rosemont Dev. Co.</u>, 244 Cal. App. 2d 666, 683

(1966)).

Here the agreement contains several references to one or more of the parties paying the

"costs" incurred by the other party:

> 16.a.  Subject to Mastronardi complying with the material terms of
> this Agreement, any breach in exclusivity of this Agreement by
> Grower will result in Grower paying to Mastronardi liquidated
> damages in the sum of $50,000 US dollars per acre of the Facility
> dedicated to production of the Product. Grower hereby further
> agrees *to* fully indemnify Mastronardi, and to <u>fully provide for all
> costs incurred by the Mastronardi in enforcing this indemnity</u>.

> 16.b.  Subject to Grower complying with the material terms of this
> Agreement, any breach by Mastronardi in purchasing all of the
> Product that meets the # 1 Product Standard produced by the
> Grower on the terms specified in this Agreement for a full crop year
> of twelve (12) months will result in Mastronardi paying to Grower
> liquidated damages . . . .  For greater certainty, this indemnity
> applies if the Grower ceases to produce the Product before the end
> of a full crop year (i.e. 12 months) by pulling the crop or otherwise
> ending the Harvest Period as a consequence of Mastronardi
> materially breaching this Agreement or failing to purchase all of the
> Product produced by the Grower and despite any termination of the
> term of this Agreement. Mastronardi hereby further agrees to fully
> indemnify Grower, and to fully <u>provide for all costs incurred by the
> Grower in enforcing this indemnity</u>.

> 18.  Grower will actively pursue obtaining and shall maintain as
> applicable for all Products sold to Mastronardi during the entire
> Term and where practically available, products liability insurance
> covering risks for Products shipped to Mastronardi in the United

States and Canada with a minimum coverage of $2,000,000 USO per incident and with Mastronardi as an additional named insured on such policy and Grower will further provide Mastronardi with a certificate of insurance reflecting such coverage. Grower will completely indemnify Mastronardi against any product liability claims that arise or relate to the Products that are directly or indirectly caused or attributable to Grower or its agents or subcontractors. <u>Grower hereby further agrees to fully indemnify Mastronardi, and to fully provide for the cost of any defense</u> and to hold Mastronardi and any and all of its affiliates, officers, directors, owners, employees and agents, completely harmless from any and all liability arising out of Grower's failure, for any reason, to comply with the Grower's warranties, representations and obligations in this Agreement and for any product liability claims that arise or related to the Products that are directly or indirectly caused or attributable to Grower or its agents or subcontractors.

19. Mastronardi will completely indemnify Grower against any product liability claims that arise or relate to the Products that are directly or indirectly caused or attributable to Mastronardi or its agents or subcontractors. <u>Mastronardi hereby further agrees to fully indemnify Grower, and to fully provide for the cost of any defense</u> and to hold Grower and any and all of its affiliates, officers, directors, owners, employees and agents, completely harmless from any and all liability arising out of Mastronardi's failure, for any reason, to comply with Mastronardi's warranties, representations and obligations in this Agreement and for any product liability claims that arise or related to the Products that are directly or indirectly caused or attributable to Mastronardi or its agents or subcontractors.

Doc. No. 1-1 at 7 (emphasis added). SunSelect argues that paragraph 16(b), quoted <u>supra</u>, authorizes the Court to award attorney's fees to SunSelect for the enforcement of its contractual claims against Mastronardi. The issue, therefore, is whether paragraph 16(b)'s use of the term "costs" includes attorney's fees. The Court concludes that it does.

The term "costs," as defined by Black's Law Dictionary, can have different meanings. One such meaning is "[t]he charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees," which are also termed "court costs." <u>Cost</u>, <u>Black's Law Dictionary</u> (11th ed. 2019). Another meaning is "[t]he expenses of litigation, prosecution, or other legal transaction, especially those allowed in favor of one party against the other." <u>Id.</u> Such costs are also termed "litigation costs" or "legal costs." <u>Id.</u> "Litigation costs" in some states include attorney's fees. <u>Id.</u>

Here paragraphs 16(a) and 16(b) of the agreement refer to "enforcement" costs, which are defined by those paragraphs as "<u>all costs incurred by</u>" one party "<u>in enforcing</u>" the other party's

indemnity obligations. Similarly, paragraphs 18 and 19 refer to "defense" costs, which those paragraphs define as "the cost of any defense" that one party may incur in defending itself against claims arising from the other party's breach of the agreement or product liability. When read in that context, the agreement's use of the term "costs" — enforcement costs and defense costs — is best interpreted as meaning "litigation costs," which may include attorney's fees. This is because in the world of indemnity enforcement and defense, such as for contractual or product liability claims, attorney's fees are usually part and parcel of the associated costs, especially when the quarreling parties are commercial entities, which is the case here.

This interpretation harmonizes with the statutory authority in California. Section 1032(b) of California's Code of Civil Procedure states that "a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Cal. Civ. Proc. Code § 1032 (emphasis added). Section 1033.5 states that "costs" allowable under section 1032 include "attorney's fees" when authorized by contract. Therefore, section 1032 and 1033.5 both use the term "costs" as including attorney's fees in certain circumstances, such as where the parties' contract provides for litigation costs and attorney's fees.

The Court's interpretation of the agreement is supported by a persuasive opinion from the Tenth Circuit in Oklahoma Fixture Co. v. Ask Computer Sys., Inc., 45 F.3d 380 (10th Cir. 1995). There, two companies entered into a contract. The contract stated that "[s]hould it be necessary for [the defendant] to initiate legal proceedings to collect monies due from [the plaintiff], [the defendant] is entitled to recover all reasonable collection costs." Id. at 380 (emphasis added). A dispute arose between the parties, so the plaintiff sued the defendant. The jury returned a defense verdict, and the defendant requested and was awarded attorney fees. On appeal, the plaintiff argued that the terms of the contract only authorized "collection costs," not attorney's fees. The Tenth Circuit disagreed. The Tenth Circuit concluded by applying California law (because the contract contained a California choice-of-law provision) that the contract's term, "all reasonable collection costs," included attorney's fees. The Tenth Circuit stated that the term is a "broad term, and a common sense reading includes attorney's fees." Id. at 382. The Tenth Circuit stated that this "is especially so when, as here, the situation that gives rise to the right to recover 'reasonable

collection costs' is where it is 'necessary for [the defendant] to initiate legal proceedings.'" <u>Id.</u> (emphasis added). For these reasons, the Tenth Circuit concluded that the contract's use of the term, "all reasonable collection costs," included the defendant's attorney's fees.

Just as the "costs" provision in <u>Oklahoma Fixture</u> was broad and was triggered by the initiation of legal proceedings, here the term "all costs" in paragraph 16(b) of the agreement is equally, if not more, broad and is specifically triggered by the enforcement of or defense against indemnity obligations, which generally occurs in legal proceedings. Accordingly, like the Tenth Circuit did in <u>Oklahoma Fixture</u>, here the Court concludes that the term "costs" in paragraph 16(b) includes attorney's fees.

**7. Privilege under California Civil Code § 47.**

Mastronardi publicly filed in this lawsuit a copy of the parties' written agreement. Mastronardi argues in its motion brief — in a mere three sentences and without any citations to case law — that its public filing of the agreement is protected by the publication privilege of California Civil Code § 47. On this basis, Mastronardi argues in its motion brief that it is immune from SunSelect's DTSA and CUTSA claims. Then, in its reply brief, Mastronardi made no mention of the privilege argument even though SunSelect earnestly argued in its opposition brief with multiple supporting legal authorities that the publication privilege of California Civil Code § 47(b) does not apply here.

In light of Mastronardi's failure to both meaningfully explicate its argument and provide the Court with supporting case law, and in light of the supporting law provided by SunSelect, the Court rejects Mastronardi's privilege argument.

# ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.    Mastronardi's motion to dismiss (Doc. No. 22) is GRANTED IN PART and

      DENIED IN PART, as follows:

      a.    SunSelect's following counterclaims are NOT DISMISSED: trade secret

            misappropriation and disclosure under DTSA and CUTSA (third and fourth

causes of action), failure to pay promptly under PACA (fifth cause of action), and false and misleading statements under PACA (sixth cause of action);

b.    SunSelect's following counterclaims are DISMISSED without prejudice: declaratory relief validating a PACA trust claim (first cause of action) and enforcement of payment from PACA trust (second cause of action);

c.    SunSelect's request for an award of attorney's fees under DTSA, CUTSA, and the agreement is NOT STRICKEN;

d.    SunSelect's request for an award of attorney's fees under a PACA trust is STRICKEN;

2.    Mastronardi shall FILE an answer to SunSelect's counterclaim within 14 days of this order.

IT IS SO ORDERED.

Dated:  __August 22, 2019__            _____

SENIOR DISTRICT JUDGE